IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 16-235 |
| | ) | |
| GREGORY BROWN, JR. | ) | |

## MOTION TO DISMISS INDICTMENT

AND NOW, comes the defendant, Gregory Brown, Jr., through his counsel,
First Assistant Federal Public Defender Michael J. Novara and David B. Fawcett,
and respectfully moves the court to dismiss the indictment lodged in the above-
captioned case.  In support thereof, counsel states as follows:

## INTRODUCTION

Wrongfully convicted in state court for a crime he did not commit, Greg
Brown languished in prison for almost 20 years as he fought to obtain the
exculpatory evidence intentionally denied him by the joint federal and state
prosecution team. Although the officials who prosecuted him resisted his efforts to
learn the truth, Mr. Brown, with the help of a *pro bono* defense team that included
the Pennsylvania Innocence Project, finally uncovered the fact that the
prosecution's two main witnesses – the only witnesses to place Mr. Brown at the
scene of the crime – had expected payment, and were in fact paid, for their
testimony. While it is common for expert witnesses to be paid, and for cooperating
criminal defendants to be rewarded for testifying, it is uncommon for witnesses and
prosecutors to cover up not only that witnesses were paid, but that witnesses
expected to be paid when they testified at trial, and were coached to deny it in order

to mislead both the judge and the jury. That is precisely what happened here.

Finally uncovered, this proven government misconduct – which the prosecution team denied and concealed for years – resulted in Greg Brown's conviction being vacated and the grant of a new trial. It also formed the basis of a motion to dismiss. However, just as the PCRA court was poised to rule on the motion, the prosecution decided not to risk proceeding further in state court and instead chose to pursue a federal indictment for the same offense, hoping to erase the past and start anew in what it now considers to be a more favorable forum. For all of the reasons discussed below, the prosecution cannot be permitted to avoid the consequences of its decades-long denial of the Greg Brown's constitutional rights, and it must be held accountable. A dismissal of the indictment with prejudice is the only appropriate and fair remedy under all of the circumstances.

Mr. Brown now stands charged federally for the same offense that the same state and federal officials pursued in state court for the last two decades. Save the prosecution's recent change in forum, nothing about this case is new. The move to a federal forum is the prosecution's latest attempt to distance itself from the prosecutorial misconduct that plagued the 1997 trial and pervaded the post-conviction proceedings; misconduct it simply could not run from in state court. The unique role of the joint, state and federal prosecutorial team in undermining Mr. Brown's rights in the course of the state court prosecution provides solid grounds for dismissal.

Federal and state prosecutors have worked as a unit since the very inception

of this case. The night of February 14, 1995, three Pittsburgh fire fighters died in a house fire in the Homewood section of Pittsburgh. That tragedy spurred an aggressive criminal arson investigation led by the United States Bureau of Alcohol, Tobacco, and Firearms ("ATF"), which involved the Pittsburgh Fire Bureau, the Pittsburgh City Arson Squad, the Pittsburgh City Homicide Squad, and the offices of the Allegheny County District Attorney and the United States Attorney. The investigation went cold without so much as a suspect until federal ATF agents began using promises of monetary gain to entice individuals to assist in the prosecution. The prosecution secured a guilty verdict on the word of paid witnesses, coached one of them – a fifteen year-old boy – to lie about the arrangement when testifying, and otherwise created the false impression with the judge and jury that financial payments to their witnesses was an impossibility.

Following the trial, members of the prosecution delivered on their promise to pay these witnesses for their testimony, destroyed all physical evidence from the fire, and aggressively stymied Greg Brown's efforts to learn the truth about the witnesses' cooperation. Notwithstanding these roadblocks, 20 years after he was convicted, Greg Brown uncovered evidence of the prosecutorial misconduct, and the PCRA court granted him a new trial on *Brady*, *Giglio*, and *Napue* grounds.

In the months following the PCRA court's decision, the prosecution dedicated its energy to recapturing its ill-gotten conviction through exhaustive and ultimately-unsuccessful challenges to the PCRA decision and, later, to the judge who authored it. When those efforts failed and the prosecution faced, at worst,

dismissal of the charges on double jeopardy grounds or, at best, a new state court trial, it changed course – unsealing a federal indictment against Mr. Brown, charging him for precisely the same conduct that had until then been the subject of the state case. The prosecution then moved for dismissal of the state court charges, citing the strategic benefits, including increased penalties, available in federal court. This late-stage change in forums offered the prosecution another advantage – denying Mr. Brown the opportunity of having the PCRA court determine the proper remedy for its misconduct.

By moving this case down the street, the prosecution seeks to distance itself from the misconduct of its members; however, this federal prosecution is plagued by exactly the same infirmities as the state prosecution. Apparently wholly undeterred by the mistakes of the past, the very players who took 20 years of Greg Brown's life by securing a criminal conviction through intentional misconduct now attempt their second bite at convicting and exacting further punishment. For Mr. Brown, it is a new chapter in a Kafkaesque nightmare that has defined the entirety of his adult life.

He now moves to dismiss the indictment on constitutional and statutory grounds:  First, under the Due Process Clause, because the prosecution's intentional misconduct and efforts to conceal it denied him a fair trial and his liberty in the years that followed, and a new trial cannot neutralize the taint of the misconduct. The prosecution's interim destruction of every shred of physical evidence from the fire, combined with the lengthy passage of time and the unavailability of witnesses,

so stacks the deck against a fair trial that this qualifies as a case where the prejudice resulting from prolonged and insidious government misconduct demands the remedy of dismissal with prejudice.

Second, the Double Jeopardy Clause requires dismissal. The change in forums cannot save this prosecution because the state and federal governments have worked together as one "super sovereign" since the inception of the prosecution against Mr. Brown. Double jeopardy principles bar a retrial – now in federal court – because the prosecution obtained a conviction for the same offense underlying conduct in state court by its own intentional misconduct. Jeopardy had attached after the PCRA court granted a new trial on the state charges and the granted the prosecution's motion for *nolle prosequi*. Under these circumstances, a federal trial is barred and the indictment must be dismissed.

Third, the indictment charging a 1995 offense of malicious destruction of property must be dismissed as untimely because the charge is barred by the five-year statute of limitations contained in Title 18, United States Code Section 3282.

Finally, this court must dismiss the indictment under the doctrine of vindictive prosecution because the prosecution improperly "upped the ante" by seeking enhanced penalties by way of a federal indictment against Greg in order to punish him for exercising his constitutional and statutory rights to challenge the ill-gotten state court conviction.

## FACTUAL AND PROCEDURAL HISTORY

### I.   The Fire

1.     At approximately 12:22 a.m., on February 14, 1995, firefighters responded to a house fire at 8361 Bricelyn Street, located in the Homewood section of the city of Pittsburgh.  *Commonwealth v. Brown*, 289 WDA 2014, 2015 WL 7458864, at *1 (Pa. Super. Ct. Mar. 20, 2015). Three firefighters – Thomas Brooks, Patricia Conroy, and Mark Kolenda – died after a stairway collapsed, trapping them in a lower floor of the home.  *Id.*

2.     8361 Bricelyn Street was a single-family residence, then rented by the Buckner family.  Living in the home at the time were: Gregory ("Greg" or "Mr. Brown") Brown, Jr.; Greg's mother Darlene Buckner; Greg's step-father Ronald Buckner; the Buckners' two-year old son, Fred; Mr. Buckner's daughter, Catherine Buckner; and Catherine's one-year old daughter Cynthia.  Greg Brown was 17 years old at the time.  *Id.*  Ron and Darlene had been renting the home and raising their blended family there since shortly after they were married, approximately seven years earlier.  *Id.*

### II.   The Investigation

3.     The investigation and prosecution in this case was a joint effort between local, state and federal officials.  According to the United States Attorney, federal and local investigators and prosecutors "worked cooperatively since the inception of the investigation after the fire occurred in 1995."[1]  Agents William

---

[1]   U.S. Attorney Statement on Indictment of Gregory Brown, Jr. for 1995 Fire that

Petraitis and Jason Wick of the United States Bureau of Alcohol, Tobacco and Firearms ("ATF") worked with investigators from the Pittsburgh City Arson and Homicide squads to investigate the fire. May 22-24, 2012 PCRA Hearing Transcript[2] ("P.T.") at 348-349.  Agent Petraitis arrived on the scene at approximately 3:00 a.m. the night of the fire to begin his "cause and origin" investigation.  Jan. 31-Feb. 7, 1997 Trial Transcript ("T-I.T.") at 119, 176. Immediately, he met with the Pittsburgh City Arson investigative team. *Id.* at 142.

4.     Within a few hours of his arrival, Agent Petraitis determined that the fire originated in the basement and, through visual inspection alone, personally concluded the fire was incendiary in nature.  T-I.T. at 163, 179, 273.  That same day, Agent Jason Wick was assigned to assist with the investigation and act as the main liaison between the ATF and the Commonwealth's prosecuting attorneys. P.T. at 154, 350.  In the days following the fire, investigators re-entered the house many times, taking photos, shooting video and collecting physical samples. They did not obtain a search warrant for the home until February 27. *See* Feb. 27, 1995 Search Warrant (attached as Exhibit A).

---

Killed Three Pittsburgh Firefighters, dated "for release" Nov. 4, 2016 and updated Nov. 8, 2016, *available at* https://www.justice.gov/usao-wdpa/pr/us-attorney-hickton-statement-indictment-gregory-brown-jr-1995-fire-killed-three ("Nov. 4, 2016 Hickton Press Release").

[2]   A paper copy of the February 15, and May 22-24, 2012, PCRA Hearing Transcripts, and the November 16, 2016 Nolle Pros Hearing Transcript will be provided to the Court under separate cover. All other transcripts referenced in this motion will be made available to the Court upon request.

5.     Law enforcement found two gasoline cans at the home.  One can was located in the basement area near a lawnmower, a short distance from the suspected origin site.  The other was found on the front porch. *Commonwealth v. Brown*, Nos. 1996-06028, 1996-08170, Opinion (Allegheny Cty. Ct. Common Pleas Sept. 15, 1998) at 2-4 (attached as Exhibit B).  Law enforcement also learned that Darlene and Ronald Buckner had purchased a $20,000 renter's insurance policy from Keystone Insurance Company on November 4, 1994, after having been renters in the house for several years. *Id.*

A.     **ATF Offers $15,000 Reward – Keith Wright Responds**

6.     Although Agents Petraitis and Wick believed the fire was incendiary, eight months after the fire, officials did not have so much as a suspect. *Id.*  So, on October 12, 1995, the Allegheny County District Attorney and ATF officials held a press conference to announce the availability of a $15,000 reward for information resulting in the arrest and conviction of anyone in connection with the Bricelyn Street fire. The press conference received extensive coverage on local television stations, broadcasting on the noon, five o'clock, and six o'clock news. *Commonwealth v. Brown*, Nos. 1996-06028, 1996-08170, Opinion (Allegheny Cty. Ct. Common Pleas Feb. 19, 2014) (granting Post-Conviction Relief Act Petition) ("PCRA Op.") at 18 (attached as Exhibit C).

7.     At 6:15 p.m. that very evening, Keith Wright, "stopped into a fire station to provide some information regarding the fire at Bricelyn Street." Ex. C (PCRA Op.) at 18.  Wright lived two doors down from 8361 Bricelyn Street,

although he had not come forward with any information in the 8 months following the fire.  Feb. 15, 2012 PCRA Hearing Transcript at 9.  The Pittsburgh Bureau of Fire reported Wright's appearance at its station to the ATF.  Ex. C (PCRA Op.) at 18. Agent Wick immediately called the fire station to speak with Mr. Wright by phone.  *Id.*

8.      Wick then traveled to the fire station to meet with Mr. Wright in person.  Ex. C (PCRA Op.) at 18; P.T. at 376-382.  During this meeting, Wright allegedly claimed he saw Gregory Brown at the scene of the fire "while smoke was emanating from a rear basement window *and before any emergency equipment was on scene.*"  P.T. at 385 (emphasis supplied); Ex. C (PCRA Op.) at 18.  This allegation was particularly important as Greg and his mother maintained that they left the home at approximately 11:45 p.m. to shop at a local Giant Eagle grocery store, and did not return until *after* firefighters and fire trucks had arrived at the scene.  Ex. C (PCRA Op.) at 18.  Thus, Wright's version of events severely undermined Greg's alibi.

9.      After speaking with Wright, Agent Wick informed his supervisor, Agent Daniel Boeh, that Wright had come forward with information immediately following the press conference.  P.T. at 383-384.  Robert Short of Pittsburgh's Bureau of Fire—a member of the investigative team—wrote and issued a report on October 12, 1995, providing the details and circumstances concerning Mr. Wright's coming forward.  *Id.* at 377-378.  The report stated that Mr. Wright came forward

after seeing ATF's 1-800 number in a story about the reward on the news that

night.  Oct. 12, 1995 Pittsburgh Bureau of Fire Report (attached as Exhibit D).

10.     Neither the report nor any of the circumstances of Wright coming

forward for a reward was disclosed to the defense prior to trial.[3]

11.     Before he testified at trial, Wright was interviewed by Agent Wick,

ATF Supervising Agent Boeh, Agent Petraitis, Assistant United States Attorney

Shaun Sweeney, and Allegheny County Assistant District Attorney E. Marcus

Clark. P.T. at 219 (Boeh; Petraitis); 384-385 (Wick); 479 (Clark); 509 (Sweeney).

Each member of the prosecution team knew that a public reward had been offered

and that there had been press coverage detailing that reward. *Id.* at 381 (Wick); 457

(ADA Clark); 507, 510 (AUSA Sweeney); 162 (Boeh); 441 (Petraitis).  Members of

the prosecution team knew Wright came forward mere minutes after the reward

was announced, and at least some knew of the Bureau of Fire report setting forth

the circumstances of his first contact with law enforcement. *Id.* at 381, 451-52.

**B.    Law Enforcement Financially Incentivizes a Teenager, Ibrahim
        Abdullah, to Cooperate.**

12.     During the summer of 1995, Greg Brown was arrested and placed in a

juvenile detention facility called Vision Quest, located in Franklin, Pennsylvania.

Detective Mary Kay Perrott of the City of Pittsburgh Arson Investigation squad

---

[3]   Indeed, the information was not discovered until 2012, when Greg Brown's
PCRA counsel located it within the Commonwealth's trial file, which prosecutors
made available for inspection after Mr. Wright testified in the PCRA hearing.

heard about Greg's arrest and immediately contacted Agent Wick to inform him. P.T. at 352-353.

13.     Agent Wick obtained Greg's placement information and contacted the facility to obtain records identifying his placement bunkmates.  *Id.*  Using this list, Agent Wick located Ibrahim Abdullah, a 15-year-old from Reading, Pennsylvania. P.T. at 391.  Abdullah was in juvenile placement for various acts of delinquency and owed a significant amount of money for victim restitution and court costs.  *Id.* at 39. In an effort to set up a meeting with Abdullah, Wick contacted Abdullah's juvenile probation officer at the time, Lou Topper.  *Id.* at 22-23.  Topper had approximately 10-20 telephone conversations with Wick prior to any face-to-face meeting between ATF and Abdullah. *Id.* at 67-68.  According to Topper, during these calls, "the money issue was brought up pretty much every time [Topper] dealt with Mr. Wick." *Id.* at 51. In turn, Topper told Abdullah what Agent Wick said about the possibility of receiving a large sum of money in exchange for his cooperation.  *Id.* at 50.

14.     As he and his school probation officers testified years later at the PCRA hearing, Abdullah found the prospect of a $15,000 reward "highly motivating," and agreed to meet with Agent Wick.  Ex. C (PCRA Op.) at 24; P.T. at 94 (Abdullah:  "It was highly motivating, highly motivating.  I was a kid.  $15,000, I've never seen it, not at that time.  I was a kid.").

15.     Abdullah first met with Wick on February 28, 1996, at the Berks County Youth Center, where he was housed at the time.  P.T. at 33, 39-40.  Wick's supervisors from Pittsburgh accompanied him to the interview.  P.T. at 354.  Agent

Wick asked for Abdullah's cooperation in prosecuting Gregory Brown.  Specifically, Wick stated that "if there was a conviction in that particular case of the firefighters in Allegheny County, there would be a reward of $15,000 for the conviction of the defendant."  P.T. at 43.  It was during this meeting, and only after the mention of a reward and in response to ATF's leading questions, that Abdullah told Wick he heard Greg admit to starting the fire in his family's home.  P.T. at 48.

16.     A few weeks later, just before Abdullah was scheduled to testify before the grand jury, Wick told him he would not be able to get the full $15,000; rather, "it was going to be more like $5,000."  P.T. at 88; Ex. C (PCRA Op.) at 24.  Abdullah told Wick he had reservations about testifying and tried to "back out of it."  P.T. at 89.  Wick had Abdullah wait in a room with the firefighters' surviving family members, P.T. at 88, who told Abdullah, "It's great what you're doing," which, he said years later, made "a real impression" on him.  P.T. at 89.  Additionally, Wick told Abdullah that another teen, also named Ibrahim Abdullah, had recently been murdered and that "[the] bullets were meant for [him]."  P.T. at 88-90.  Abdullah continued to cooperate and testify against Greg Brown.

17.     Between the grand jury proceedings and trial, Abdullah relied on Wick for assistance in small matters including "[m]oney here and there, $50, $200" and even with getting a copy of his birth certificate.  P.T. at 94.  The expectation of a much larger payout after trial impacted Abdullah.  So too did speedy car rides in Agent Wick's vehicle during which Wick boasted about his power.  *Id.* at 134 ("they

[FBI] make a little bit more money, but we got more power"). Unsurprisingly, fifteen-year old Abdullah thought Agent Wick was "cool." *Id.* at 101.[4]

18.    In November 1996, Probation Officer Topper turned over supervision of Abdullah to another probation officer, Stanley Cooper. P.T. at 186. During the transition, the men discussed the reward money and how it was impacting Abdullah's adjustment on probation. P.T. at 187. During Cooper's first meeting with Abdullah, the boy brought up the subject of the reward money. P.T. at 190. As Abdullah spoke, "his eyes got kind of bright when he started talking about the $15,000 and how he could help his family." *Id.*; Ex. C (PCRA Op.) at 25. Cooper was concerned, however, as he felt it would "interfere with [Abdullah's] treatment and his focus in treatment and his commitment to the treatment process." P.T. at 190-191. Indeed, Cooper came to feel the expectation of the reward "was kind of consuming to [Abdullah], something that was at the core of him." P.T. at 194.

19.    The mother of Abdullah's two children, Adrian Duson, lived with Abdullah during the summer before Greg Brown's trial. P.T. at 228. Ms. Duson reported that during that time, Abdullah had frequent contact with Agent Wick, asking for "his money." P.T. at 234-235; Ex. C (PCRA Op.) at 25. Indeed, it

---

[4]    "Q. And that's what I wanted to ask you. How did you see – When you were 15 years old and you saw Mr. Wick, how did you view him?

A. Come on. I mean, football player, love football, wear suits. And, you know, me and him talked. He was cool. He was cool. Me and him used to talk. He said I probably be good at what he do and all this stuff. That was pretty cool." P.T. at 101.

appeared to her Abdullah was "harassing" Agent Wick.  P.T. at 243; PCRA Opinion
at 25.  Getting the promised $5,000 was Abdullah's "main objective."  P.T. at 238.

20.     No one on the prosecution team ever disclosed that Abdullah had any
expectation of receiving monetary compensation for his testimony.

### III.   The 1997 Trial

21.     Gregory Brown and his mother Darlene Buckner were charged in the
Allegheny County Court of Common Pleas with second-degree murder, arson,
insurance fraud and related offenses.  From January 31, 1997 to February 19, 1997,
they were tried together before a jury presided over by the Honorable David
Cercone, then a judge in the Criminal Division of the Allegheny County Court of
Common Pleas.  *Brown*, 2015 WL 7458864, at *2.  The prosecution team at trial
consisted of Assistant District Attorney E. Marcus Clark, Assistant United States
Attorney Shaun Sweeney, and ATF Agent Jason Wick. Ex. C (PCRA Op.) at 5, 26.

22.     The prosecution's theory was that Mrs. Buckner asked her then
teenage son Greg to set fire to the family's home to collect on a $20,000 renters'
insurance policy.  Feb. 18, 1997 Trial Transcript ("T-III.T") at 117-120.  Greg and
his mother had an alibi, namely, that they were not at home when their house
caught fire.  *Brown*, 2015 WL 7458864, at *1.  As Mr. and Mrs. Buckner would later
advise the insurance company, Mrs. Buckner and Greg were not home when the fire
started because they had made a late-night run to the Giant Eagle grocery store in
Fox Chapel – several miles away – and did not return until around midnight, to the
sight of the house in flames.  Feb. 10-14, 1997 Trial Transcript ("T-II.T.") at 256.

Darlene Buckner went to the Giant Eagle late that night to buy ingredients for a dish she offered to bring to a funeral reception the following day – a Giant Eagle receipt proved Mrs. Buckner was at the store, but prosecutors argued that Greg was not with her.

23.     Greg and his mother were acquitted of the conspiracy counts. Greg was convicted of two counts of arson, three counts of second-degree homicide, and insurance fraud.[5] On April 21, 1997, Greg was sentenced to three mandatory terms of life without the possibility of parole for each of the 2nd degree murder convictions. *Brown*, 2015 WL 7458864, at *2.  Greg additionally received a consecutive 7½ to 15 year term for the arson-endangering a person and arson-endangering property convictions. *Id.*

A.     **The Centerpiece of the Prosecution's Case: Keith Wright and Ibrahim Abdullah**

24.     The evidence specifically implicating Greg Brown was limited.  There was no evidence of communication between him and his mother about a planned arson; no fingerprints on a gas can; no gasoline on Greg's skin or clothes; no witnesses seeing him start or flee the fire; no evidence that he purchased an accelerant or took steps planning an act of arson.  Rather, to prove Greg guilty of arson, the prosecution relied on two witnesses:  Abdullah and Wright.

25.     Ibrahim Abdullah's testimony regarding Greg's role in causing the fire was brief, though impactful.  His testimony consisted largely of "Yes, sir" in

---

[5]     Mrs. Buckner was acquitted of all charges but one; she was found guilty of insurance fraud – for that portion of a sworn statement to the insurance company stating that Greg accompanied her to the store.

response to a series of leading questions by the prosecution.  T-II.T. at 136-138.
Abdullah said "yes" in response to questions about whether he had "some
conversations" with Greg Brown in the summer of 1995, T-II.T. at 136; whether
Greg told him he had "personal involvement" in "a fire incident in Pittsburgh, *id.*;"
whether Greg told him he started the fire, *id.*; and that it "was the one where three
firefighters died."  *Id.* at 137-38.  Abdullah also testified that Greg admitted to
staying around the area of the fire afterwards and referred to the firefighters as
"fire heads."  *Id.* at 138.

26.     Keith Wright testified that, on the night of the fire, he looked out of his
window and saw Greg standing in front of his burning house before fire trucks
arrived.  *Id.* at 58-59.  Despite many people being on the scene, Wright was the only
person to testify that Greg was at the scene prior to the firemen arriving.[6]  That
testimony was material because it contradicted Greg's defense and his mother's
testimony that they both went to the store and when they returned, the fire trucks
were already on the scene.  Ex. C (PCRA Op.) at 18 (internal citations omitted)
("Keith Wright's revelation poked a serious hole in [Greg's] alibi.  But, the alibi
would not have taken such a serious blow to its believability if the jury knew Keith
Wright had a possible motive for coming forward.  That motivation being a
monetary reward"); *id.* at 22 ("Keith Wright was not your ordinary witness.  He was

---

[6]     Several defense witnesses testified to the contrary, and corroborated the
testimony of both Mrs. Buckner and Greg that they arrived home *after* the fire had
started. *See*, *e.g.*, T-II.T. at 495-502 (testimony of next-door neighbor Marian
Moyer); *id.* at 482-93 (testimony of neighbor Jean Ferguson).

very important to the prosecution.  The ATF Supervisor said it best. Keith Wright's information broke the alibi and showed deception on the part of Greg Brown's mother.").

### B.   The Impact of the Constitutional Violations

27.     The testimony of Wright and Abdullah was the lynchpin of the prosecution's case, and the inability to challenge the credibility either of them with the improperly-withheld *Brady* evidence was devastating to Greg's defense.

28.     Though the motivation for their testimony was raised at various points at trial, both witnesses categorically denied any financial motive for their testimony.  Because evidence of the financial incentives provided to each was suppressed by the prosecution team, the defense was not able to effectively impeach either witness.

29.     On cross-examination, defense counsel asked Wright, "[W]as there ever any discussion about any reward for you providing this information?"  T-II.T. at 95. Wright's answer was succinct and unequivocal: "No, sir."  *Id.*

30.     Abdullah was equally succinct and unequivocal when denying an expectation of any benefit.  On direct examination, the prosecutor asked him, "at any time in the past couple of years, has anyone from the District Attorney's office, or any law enforcement agency, made any promises or representations to you about your testimony in this particular case?"  T-II.T. at 134-135.  Abdullah, like Wright, responded: "No, sir."  *Id.*  The prosecutor pursued the subject further: "[W]hy are you testifying here today?"  *Id.*  Abdullah said, "It seems like the right thing to do,"

and added that his mother "sat me down and talked about it. She said I should do it." *Id.*

31.     Abdullah was asked specifically about his dealings with Agent Wick, who was in the courtroom.  T-II.T. at 139-140.  When asked if Wick ever said he "might be able to do [something] for [Abdullah] in exchange for [his] testimony," Abdullah falsely denied that he had.  T-II.T. at 140.  In truth, prior to trial, Agent Wick created a clear expectation of payment in Abdullah, but on the way to court told Abdullah to deny any possibility of money if the topic arose.  P.T. at 100-101.  Abdullah later recounted that Wick said, "They are going to ask you stuff like, you know, did I promise you anything. Truth is, I never said 'promise.' I never—you know, I never promised you anything."  P.T. at 138; P.T. at 100 (By his own account, Abdullah "knew [he] was going to get [a significant financial benefit]").  Wick, having coached Abdullah to lie, did nothing to correct Abdullah's false testimony; nor did either of the prosecutors.

32.     Then-ADA Clark, now retired, candidly admitted during the PCRA proceedings that Abdullah's credibility was a concern for him, and that if evidence had been presented to the jury that tended to undermine that credibility, Abdullah's testimony likely would not have been believed.  P.T. at 464-467.

33.     Al Lindsay, Greg's trial counsel, having suspicions but no evidence that Abdullah expected a benefit in exchange for his testimony, cross-examined Abdullah only briefly.  T-II.T. at 142-146.  Abdullah admitted on cross-examination that he previously told investigators he didn't believe Greg when he said he started

the fire.  T-II.T. at 146.  But, as Lindsay explained at the PCRA hearing, he could not effectively challenge Abdullah's testimony that he was simply testifying, at his mother's urging, because it was the right thing to do.  P.T. at 120, 322-323.

34.     In an attempt to establish that the prosecution might be offering something in exchange for testimony, the defense offered the testimony of Greg's childhood friend, Raoul Gibson.  Gibson offered no testimony about the fire, but told the jury that Wick had contacted him and offered him money if he would get Greg to admit he started the fire.  T-II.T. at 729-730; Ex. C (PCRA Op.) at 28.  Gibson recounted that Wick came to see him sometime in 1996 in South Carolina, where he was living.  They sat on his grandmother's porch, and Wick asked the boy to take a walk with him.  T-II.T. at 729-730.  When the two were alone, Wick offered Raoul $7,000 for his assistance.  *See id.*; Ex. C (PCRA Op.) at 28.

35.     During his cross examination of Gibson, AUSA Sweeney belittled the notion that the prosecution could pay any witness a reward for testifying.  He mocked Gibson: "You think there is a fund somewhere with $7,000 that agents can just go grab and pay you?"  Gibson responded that he didn't know.  T-II.T. at 732; Ex. C (PCRA Op.) at 28.  Meanwhile, when AUSA Sweeney asked his question, he was fully aware that a reward fund *had* been created, and that it contained $15,000 to pay witnesses.  P.T. at 511-512 (AUSA Sweeney testifying that, at the time of trial, he "knew there was a reward").

36.     It was not until after the close of evidence and Mr. Lindsay's closing argument that Mr. Lindsay learned for the first time that ATF had posted a $15,000

reward "for information leading to the arrest and conviction of the person or persons responsible for the arson fire at 8361 Bricelyn Street."  1995 ATF Reward Flyer (attached as Exhibit E); T-III.T. at 91.  Mr. Lindsay also belatedly learned that, on the anniversary of the fire, ATF sent a letter to all residents of Bricelyn Street reminding them of the reward. P.T. 290. *See also* Feb. 14, 1995 Letter to Bricelyn Street Residents (attached as Exhibit F). Although he still knew nothing of the specific offers to Abdullah and Wright, Mr. Lindsay nevertheless moved to re-open the evidence to submit the fact to the jury that a general reward had been posted, arguing that the existence of even a general reward was critical information for the jury to hear in assessing the credibility of, in particular, Wright.  T-III.T. at 89-98. In arguing that the evidence should not be re-opened, ADA Clark indicated that he did not have the letter that was sent to Bricelyn Street residents. T-III.T. at 90. AUSA Sweeney represented that, "[n]o witness or that reward has never been discussed, ever."  *Id.* at 90.  The court denied Mr. Lindsay's request.  *Id.* at 98.

## IV.   After Trial

### A.   Post-Conviction Requests for Relief are Unavailing Due to the Prosecution's Subterfuge

37.   In post-trial motions, Greg's counsel sought an evidentiary hearing to explore a *Brady* claim on the basis that the prosecution withheld exculpatory evidence of the existence of the $15,000 reward fund.  Ex. C (PCRA Op.) at 5; *Brown*, 2015 WL 7458864, at \*2.  Given the prosecution's arguments that no proof existed of financial incentives, the trial court denied the request.  Ex. C (PCRA Op.) at 6; *Brown*, 289 WDA at \*4.

38.     On appeal, given the lack of any evidence of an understanding, an expectation or an agreement with any specific witness, the Superior Court upheld the trial court's decision not to hold a hearing "on the issue of whether government agents offered financial rewards to potential witnesses that may have induced false testimony," *Brown*, 2015 WL 7458864, at *2, and affirmed the convictions.  The Pennsylvania Supreme Court denied Greg's petition for allowance of appeal.  *Id.*

39.     After exhausting the direct appeal process, Greg filed a federal *habeas corpus* petition in 2001.  *Id.* at *3.  In his petition, he claimed, *inter alia*, that his due process rights were violated because the prosecution financially induced testimony against him without disclosing information regarding the inducement. *Id.*  Greg's federal habeas counsel filed a Freedom of Information Act ("FOIA") request with ATF seeking information regarding payment of witnesses.  *Id.*  In response, the prosecution failed to provide any information indicating that witnesses were paid. *Id.*

40.     At oral argument on Greg's federal *habeas* petition, the Commonwealth's attorney, Assistant District Attorney Ronald Wabby, addressed the issue of whether payments were made to Keith Wright. *Brown v. Vaughn*, Civ. Action No. 01-1699 (W.D.Pa), Doc. No. 30 (Transcript of Dec. 5, 2002 Proceedings), at 36. He represented that he had contacted the trial prosecutors, ADA Clark and AUSA Sweeney, who told him "they did not pay anybody."  *Id.* at 36.  In fact, "rewards had been paid to Wright and Abdullah *four years earlier*."  *Brown*, 2015 WL 7458864, at *13 (emphasis added).  Mr. Wabby conceded that "had payments

[been] made, yes, we would have had to disclose them," *Brown v. Vaughn*, Civ.

Action No. 01-1699 (W.D.Pa), Doc. No. 30 (Transcript of Dec. 5, 2002 Proceedings)

at 26, while insisting that there was "no evidence that would suggest that there was

some type of payments made to" Wright and Abdullah." *Id.* at 27. [7] It is now

understood that this argument was false.[8]

      41.    In 2004, again because of a lack of evidence of any specific

arrangement with any specific witness, the district court denied Greg Brown's

federal *habeas* petition without a hearing. *See Brown v. Vaughn*, Civ. Action No.

01-1699 (W.D.Pa), Doc. No. 26.   The Court of Appeals for the Third Circuit denied

Greg's request for a certificate of appealability. *See Brown v. Vaughn*, Civ. Action

No. 01-1699 (W.D.Pa), Doc. No. 29.

    **B.**   **Proof of Witness Payments is Finally Uncovered**

      42.    In 2004, Greg contacted the Innocence Institute at Point Park

University to request its help in proving his innocence. *Brown*, 2015 WL 7458864,

---

[7]   At another point in his argument, Mr. Wabby attested as follows: "Your Honor, if we had paid those witnesses, we would have disclosed it. I mean, I can state that. I mean, that's our office. Our office is very broad on discovery. We basically give more than we're supposed to give. And if we had knowledge that our witnesses were paid either by our office or by the Federal Government, we would have disclosed it. But we did not. We had no evidence to suggest that." *Brown v. Vaughn*, Civ. Action No. 01-1699 (W.D.Pa.), Doc. No. 30 (Transcript of Dec. 5, 2002 Proceedings), 28-29.

[8]   The PCRA court referred to the arguments made by the Commonwealth's attorney in the federal habeas proceedings as "[t]he most egregious lapse in judgment." Ex. C (PCRA Op.) at 19.  The PCRA court found that the misinformation was propagated because the Commonwealth's federal habeas attorney failed to "ask[] those with knowledge a simple question – were [Abdullah and Wright] paid?" *Id.* at 20.

at *13.  The Institute began investigating his case in 2009, "as part of its consideration of arson cases based on faulty expert scientific testimony."  *Id.*

43.     Based in part on the Institute's work, in 2010, Greg filed a *pro se* Motion for Post-Conviction Collateral Relief ("PCRA") in state court, alleging newly-discovered information suggesting the fire was not incendiary.  *Id.*  The matter was assigned to Judge Joseph Williams, III.  Upon Greg's request, the court appointed PCRA counsel to represent him.  *Id.*

44.     During this time, the Institute filed a FOIA request regarding, among other things, the payment of reward money.  *Id.*  In response, and after back-and-forth communications between *pro bono* counsel and the ATF, copies of checks and check requests were produced, with all identifying information redacted, but "showing that checks of $5,000 and $10,000 had been issued in August of 1998 in connection with the Bricelyn Street fire case."  *Id.*  ATF denied subsequent requests by Greg's counsel to learn who was paid.[9]  *Id.*  Meanwhile, back in 2005, the ATF destroyed all physical evidence in its possession relating to Greg's prosecution. *See* May 20, 2005 ATF Reports of Destruction (attached as Exhibit G).

45.     Representatives of the Institute then tracked down Abdullah, who admitted he "receive[d] $5,000 from ATF Agent Wick" after Greg Brown's trial. *Brown*, 2015 WL 7458864, at *4.  He also said "he understood that he would receive

---

[9]     In response to a Pennsylvania Right to Know request made by the Institute, the Allegheny County District Attorney's Office provided copies of the same redacted checks. *Brown*, 2015 WL 7458864, at *3.

that money at the time he testified." *Id.* The Institute made various attempts to locate Keith Wright, but it was unsuccessful. *Id.*

46.    After uncovering this evidence, the Institute asked the prosecution to acknowledge that it had paid witnesses and to provide the truth regarding the situation. Aug. 16, 2010 Letter from Innocence Institute of Point Park University to representatives of the Office of the United States Attorney for the Western District of Pennsylvania and the Allegheny County District Attorney's Office (attached as Exhibit H).

47.    In response, for the first time since Greg's conviction over a decade earlier, the prosecution acknowledged witnesses were paid; however, it disclaimed any constitutional violation or other impropriety, representing that, although two witnesses had been paid *after* trial, they had absolutely no expectation of payment *prior* to trial:

> ATF Special Agent Jason Wick interviewed the witnesses prior to trial, and Assistant District Attorney Marc Clark and Mr. Sweeney met with the witnesses prior to trial. Neither Agent Wick nor the prosecuting attorney discussed the subject of rewards with the witnesses prior to or during the trial. The subject of the public reward offered by ATF for information regarding the Bricelyn Street fire did not arise during any of their discussions with the witnesses.

Aug. 25, 2010 Letter from the acting United States Attorney for the Western District of Pennsylvania to the Innocence Institute of Point Park University (attached as Exhibit I).

48.    The letter went on to proclaim, "Long after the trial was over, ATF decided to pay reward money to two witnesses. The agent who paid the reward

money to those two witnesses on behalf of ATF stated that the witnesses were of course glad to receive the rewards, but they were also surprised because they had never asked for a reward and had never been told that they would receive a reward." *Id.*

49.    On September 17, 2010, Greg Brown's PCRA counsel filed a first amended PCRA petition.  Counsel filed two more FOIA requests with ATF in May and June of 2011.  *Brown*, 2015 WL 7458864, at *4.  "ATF provided redacted documents on July 11, July 27, August 2, and August 10, 2011.  None of these materials revealed the names of the recipients of the reward money."  *Id.*  However, during this time period, PCRA counsel was able to make contact with Wright.  *Id.*  "In December of 2011 and January of 2012, Wright acknowledged receiving $10,000 from ATF for his testimony," and indicated that, "at the time of trial, he understood that he could receive reward money from ATF."  *Id.*  In January of 2012, ATF provided documents confirming Wright's receipt of payment.  *Id.*  Greg filed a second amended PCRA petition in February 2012, including a claim based on this newly-discovered evidence of Wright's payment and expectation of the same.

50.    Greg's counsel conducted extensive investigation in an attempt to determine whether they could prove that, at the time they testified at Greg's trial, these key prosecution witnesses expected payment from the prosecution. Former Berks County probation officers Lou Topper and Stanley Cooper were located and "corroborated that Abdullah was expecting to be paid reward money by ATF," as did

Abdullah's former girlfriend, Adrian Dusan. *Id.* Based on that information, Greg filed a third amended PCRA petition. *Id.*

51.     Months after Keith Wright testified at the PCRA hearing[10] with little recollection of dates and times, PCRA Counsel discovered the October 12, 1995 Pittsburgh Bureau of Fire Report within the files of the District Attorney which explained the circumstances of Wright's stepping up to cooperate, including that Wright initially contacted law enforcement "after watching a news story announcing a possible $15,000 reward." *Id.*; *see also* Ex. D (Bureau of Fire Report). Greg filed a fourth amended PCRA petition incorporating this new information, which was soon followed by a fifth amended petition alleging an ineffective assistance of counsel claim for lack of adequate investigation. *Brown*, 2015 WL 7458864, at *5.[11]

C.     **PCRA Court Finds ATF's Denials Incredible and Grants New Trial**

52.     The PCRA court heard evidence with respect to Greg's PCRA petitions on February 15 (preservation testimony of Keith Wright), and from May 22 through 24, 2012.

---

[10]     Wright's PCRA testimony was taken several months prior to the bulk of the PCRA proceeding as a means of preserving his testimony, given Mr. Wright's health concerns.

[11]     Greg Brown subsequently filed an amended petition adding a claim that his three life sentences were unconstitutional under *Miller v. Alabama*, __ U.S. __, 132 S.Ct. 2455 (2012), which invalidated mandatory life without parole sentences for juveniles, finding such sentences cruel and unusual.

53.   Among the many witnesses who testified were:

- **Keith Wright:** Although the Bureau of Fire Report remained hidden in
  prosecution files when Wright testified at the PCRA hearing, such that his
  recollection of events could not be refreshed, Feb. 15, 2012 PCRA Hearing
  Transcript, 47-48, 50, Wright testified that he heard about the reward
  "through ATF," *id.* at 63, sometime before trial, and that he was not
  surprised when he received payment after trial. *Id.* at 60, 62-63. Upon
  reviewing the Bureau of Fire Report, and considering Wright's testimony,
  the PCRA court found that Agent Wick had discussed the money with
  Wright before he testified at trial. *See* Ex. C (PCRA Op.) at 19.

- **Ibrahim Abdullah:** Abdullah, then a 34 year-old man, gave extensive
  detailed testimony regarding his interactions with Wick, and testified
  "Topper informed him that ATF was offering $15,000 for information
  leading to a conviction," and "that the money was a highly motivating
  factor in his cooperation with ATF." *Brown*, 2015 WL 7458864, at *5.
  Abdullah testified that Agent Wick gave him the expectation that he
  would get paid after testifying against Brown. *Id.* "In addition, Abdullah
  provided that, in preparing him to testify at trial, Agent Wick told him, 'I
  didn't promise you anything, so if they ask you if you was promised
  anything, you know, you wasn't – I never said I promised you anything;
  right? and I was like, 'Yeah.'" *Id.* at *5 (quoting Abdullah's PCRA hearing
  testimony).

- **Lou Topper:** Berks County probation officer Topper, now living in Florida, testified that he was Abdullah's probation officer when he began cooperating with ATF.  Topper also provided great detail regarding the situation, and testified "that Agent Wick would frequently contact him about Abdullah's cooperating in the case," "that there were discussions regarding money" and "that Abdullah knew there was a $15,000 reward." *Id.* at *5.  He also testified that he attended the initial meeting between ATF and Abdullah on February 28, 1996, and that "Wick's questions suggested answers to Abdullah." *Id.*; *see also* P.T. at 47 (Topper testified that "[t]here was questions asked.  There was silence from Ibrahim's point of view, and then there was counter from Mr. Wick.  Did it happen this way?  Did this happen?  Did that happen?); 47-48 ("Q: Did Mr. Wick in any of his questions suggest answers?  A: Oh, very much so."). "Topper was sure that Abdullah was aware of the reward offer and stood to gain from providing information." *Brown*, 2015 WL 7458864, at *5.  Indeed, he testified that "[t]he money issues w[ere] brought up pretty much every time [he] dealt with [Agent] Wick," between ten and twenty times. *Id.* at *5 (internal citation omitted).

- **Stanley Cooper:** Former Berks County probation officer Cooper, who took over supervision of Abdullah after Topper, testified consistent with Topper's testimony that Abdullah expected to receive reward money, and

added that Abdullah was excited about the possibility of receiving the money.  *Id.* at *6.

- **Adrian Dusan:**  The mother of Abdullah's two children, Adrian Duson, came in from California and gave corroborative testimony, "confirm[ing] that Abdullah knew that he would receive money," "that Agent Wick and Abdullah were in frequent contact;" and that Abdullah "received other money from Agent Wick, aside from the ATF reward."  *Id.* at *6.

- **William Moushey, Jr.:** then-Director of the Innocence Institute at Point Park University, Mr. Moushey testified that he received a letter from "a first Assistant United States Attorney, dated August 25, 2010, wherein the attorney explicitly stated that neither Agent Wick, nor the prosecuting attorneys, discussed rewards before or during trial."  *Id.* at *6.

- **Alexander Lindsay**: Greg's trial attorney, Alexander Lindsay, testified that the Commonwealth never disclosed that any witnesses had an expectation of payment, or any documentation related to the rewards.  *Id.* at *6.  He explained the prejudice caused by the inability to efficiently cross-examine the prosecution's key witnesses about their assertions they had nothing to gain by testifying against Greg.  P.T. 299-300.

- ATF Agent Jason Wick also testified at the PCRA hearing.  He categorically denied monetary arrangements.  His testimony contained few details and was wholly inconsistent with that provided by Topper, Cooper and Abdullah himself. According to Wick, "the subject of the

reward was never talked about with Abdullah." Ex. C (PCRA Op.) at 26.

The PCRA court found this and other portions of Agent's Wick's testimony

lacked credibility, and had been "buried in an avalanche of evidence and

common sense that show[ed] otherwise." *Id.* at 26. *See also id.* at 24, n.21.

54.     On February 19, 2014, the PCRA court granted Greg's PCRA petition,

vacated his conviction and sentence, and ordered a new trial based upon due

process violations grounded in *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v.

Illinois*, 360 U.S. 264 (1959).  With respect to Greg's *Brady* claim, the PCRA court

found that the prosecution team failed to disclose that Abdullah and Wright had, at

the time of their testimony, an expectation of reward payments for their cooperation

in Greg Brown's prosecution, and that the failure to disclose this information

rendered Greg's "trial so unfair" as to undermine "confidence in the guilt

determination." Ex. C (PCRA Op.) at 27.  The *Napue* claim was rooted in the

prosecution team's (1) failure to correct the false impression left by Abdullah and

Wright's testimony as to the prospect of financial gain for their testimony; and (2)

creation of a false impression that no reward fund existed, through the questioning

of a defense witness, Raoul Gibson.  Ex. C (PCRA Op.) at 28 ("Upon cross-

examination, the prosecutor, Shaun Sweeney, asked Gibson, 'You think the agents

have some pile of money they can grab to pay witnesses? . . . Gibson's response: I

couldn't tell you that.") (internal citations omitted).

D.    PCRA Relief Affirmed on Appeal.

55.    The prosecution appealed the order vacating Mr. Brown's sentence and granting a new trial.  It also objected to any reasonable bond, such that Greg remained incarcerated during the appeals.

56.    On March 20, 2015, the Superior Court issued a 24-page memorandum opinion affirming the PCRA court's decision.  *See Brown*, 2015 WL 7458864. The prosecution sought leave to file an appeal with the Supreme Court of Pennsylvania and was denied on August 31, 2015.

57.    The prosecution did not file a petition for allowance of appeal.  As such, the findings of the PCRA court as affirmed by the Superior Court of Pennsylvania are final, conclusive and binding.

E.    Post Appeal, the Prosecution Takes Extreme Measures to Avoid its Chosen Forum

58.    In October 2015, after the case was remanded and remained assigned to Judge Williams for trial, the prosecution, apparently no longer satisfied with its chosen state forum, filed a motion to disqualify Judge Williams.  The prosecution alleged that the judge's findings – which had been upheld on appeal – demonstrated "bias." Commonwealth's Corrected Motion to Recuse and Brief in Support of Motion to Recuse, filed Oct. 27, 2015, at 10 (attached as Exhibit J).

59.    The prosecution also claimed in its motion that, "during the course of the PCRA proceedings," the court "displayed a bias against the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives . . . in general as well as toward specific

- 31 -

agents, who were involved in the PCRA proceedings and/or had other contact with the" court. *Id.* at 2.  The court held a hearing on the motion on November 18, 2015.

60.     The prosecution provided no testimony or evidence to support its bias allegations, electing to rest solely on its argument that the PCRA court's findings themselves established bias.  Nov. 18, 2015 Recusal Hearing Transcript, at 2. Judge Williams denied the motion.

61.     The prosecution appealed, and the Superior Court affirmed Judge Williams on August 9, 2016. *Commonwealth v. Brown*, 1817 WDA 2015 (Pa. Super. Ct. Aug. 9, 2016).

62.     After the case was again remanded to the Court of Common Pleas in the fall of 2016, a schedule was finally set for filing of dispositive motions and a new trial was set to commence on January 4, 2017.

63.     In accord with the court schedule, Mr. Brown moved to dismiss the charges on double jeopardy grounds, based on the years of subterfuge on the part of the prosecution team, and the motion was fully briefed.  *See* Defendant Gregory Brown, Jr.'s Motion to Dismiss Prosecution on Double Jeopardy Grounds, filed Oct. 12, 2016 (attached as Exhibit K, excluding exhibits to motion).

64.     On November 4, 2016, two months before trial, and just as Mr. Brown's Motion to Dismiss was to be decided by Judge Williams, the same joint state and federal prosecutorial team that opted to bring this case in state court 20 years earlier, announced they would seek to dismiss the charges and instead pursue a new federal indictment.

65.     The federal indictment charges Greg Brown with malicious

destruction of property by fire resulting in death, under 18 U.S.C. § 844(i), in

connection with the same fire which was the subject of the state court prosecution.

*See* Doc. Nos. 1, 2.

66.     The Commonwealth simultaneously filed a motion for *nolle prosequi* to

dismiss the state charges.

67.     The actions of the state and federal prosecutors in moving to drop the

state case in favor of a federal prosecution, just as the state case was heading

toward dismissal or trial, was a coordinated team effort, as acknowledged in a press

release issued that same day:

> Federal and local investigators and prosecutors have worked
> cooperatively since the inception of the investigation after the fire
> occurred in 1995. Even though jurisdiction existed in both state and
> federal court, it was agreed between the Allegheny County District
> Attorney's office and the United States Attorney's Office that the case
> would originally be brought in state court and a joint prosecution team
> from both offices would prosecute the case.
>
> *   *   *
>
> [But] [s]ubstantial questions have been raised which undermine
> confidence in retrial in state court.
>
> After a thorough review of the evidence and in consultation with the
> Allegheny County District Attorney, and after application of the
> Principles of Federal Prosecution, we have decided that the interests of
> justice are best served by a trial of this matter in federal court. . . .

Nov. 4, 2016 Press Release, *supra*.

68.     Mr. Brown opposed the state court *nolle pros* request, arguing that the

prosecution team did not have a valid reason for changing forums 20 years after the

inception of the state prosecution against him.  He also argued that he had been denied his right to a speedy trial, and that dismissing the state charges would exacerbate the speedy trial violation while denying him an effective remedy.  *See* Defendant Gregory Brown, Jr.'s Objections to Motion for *Nolle Prosequi* and Supplement to Motion to Dismiss on Double Jeopardy Grounds, filed Nov. 15, 2016 (attached as Exhibit L).

69.    Meanwhile, on November 14, Mr. Brown appeared in federal court on the new federal charges.  Although, by that time, he had spent approximately 20 years in prison for the alleged offense, the prosecution stated it would be agreeable to release on an unsecured bond.  *See* Doc. No. 13.

70.    The Court of Common Pleas heard argument on the *nolle pros* motion on November 16, 2016.  In arguing for dismissal of the state charges, the prosecution acknowledged that the investigation and prosecution in this case "has always been a joint effort" by state and federal authorities.  Nov. 16, 2016 Hearing Transcript, at 10.  It stated that, "[i]n 1997, when the trial occurred . . . it was decided that state court was the more appropriate place to try the case . . . [but c]ircumstances have certainly changed since then."  *Id.*  Specifically, the prosecution claimed sentencing considerations as their basis for move to federal court: "[i]n 1996, despite – regardless of the age of the defendant, the Commonwealth had a mandatory life sentence. We no longer have that. Our potential sentences are roughly the equivalent of the state's term of years to life potential sentence."  *Id.* at 10-11.

- 34 -

71.     The prosecution also highlighted what it claimed are evidentiary and other strategic benefits of a federal forum and indicated that, like the state case, the federal prosecution would be a joint governmental pursuit, which fully served the interests of the Commonwealth:

> In addition, the federal prosecution provides the Commonwealth with evidentiary benefits. There are – given that we are now having only Commonwealth versus Gregory Brown and no longer Darlene Buckner sitting here, there are evidentiary issues in terms of the motive for this crime that we will be able to get into evidence down in federal court that will likely be precluded here. So based on an evaluation of the evidence, that is certainly a factor that was considered.
>
> Additionally, as I indicated, many of the witnesses were from federal agencies. The Commonwealth has been advised by supervisors within the ATF that the ATF would fight our efforts to subpoena several of their or certain of their agents should we proceed in state court. Therefore, *we* would lose those witnesses, which would greatly hinder *our* ability to try the case, as would the loss of motive evidence.

*Id.* at 11-12.

72.     On November 16, 2016, the Court of Common Pleas granted the *nolle pros* motion, and dismissed the state case.

73.     On November 18, 2016, after serving 20 years in prison, Mr. Brown was released from custody pending further proceedings in this court.

## IV.     Unfair Prejudice Unavoidable if Case Tried Now, Decades after Fire

### A.     Destruction of Evidence

74.     The prosecution's case wholly depends upon a finding that the Bricelyn Street fire was incendiary – *i.e.*, intentionally started by an arsonist.

75.     Mr. Brown vigorously disputes that this was an act of arson and, instead, maintains that various other probable, accidental causes – like the furnace or the home's electrical system – were never properly investigated or analyzed.

76.     Shortly after the fire, the Bricelyn Street house was razed, resulting in the loss of all fire debris apart from that previously collected and stored by law enforcement agencies.

77.     Years after the fire and after Mr. Brown's conviction, but while the prosecution was still concealing the fact that its witnesses had been paid, the ATF destroyed all of the evidence gathered from the scene.  Ex. G (ATF Reports of Destruction).  ATF also discarded all of the samples taken from the scene for testing by the prosecution. *Id.*

78.     As a result, Mr. Brown, his current counsel and experts are denied the opportunity to investigate and analyze other probable causes of the fire – like the furnace – and cannot examine or test any of the evidence taken from the basement of the house for chemical analysis.  That is, if this prosecution is permitted to proceed, the prosecution alone will have had access to the physical evidence for testing and analyses.

**B.      Death of Prosecution Witness Prevents Fair Examination of Evidence**

79.     The lynchpin of the prosecution's theory that the fire was incendiary is the chemical analysis, known as chromatography, done by ATF Chemist, William Kinard.  Kinard ultimately opined that two of the 13 samples submitted from the Bricelyn Street basement contained traces of burnt gasoline, thereby supporting

ATF Agent Petraitis' initial, personal conclusion that the fire was deliberately set by pouring an accelerant on the basement floor.  T-I.T. at 162-163 (Petraitis testimony); *id.* at 239-240 (Petraitis testimony); *id.* at 365-366 (Kinard testimony).

80.    Documents produced by the prosecution show that (a) Kinard originally opined that gasoline was *not* present in any of the 11 samples he tested, *see* Feb. 21, 1995 ATF Memorandum Request for Fire Analysis Consultant (attached as Exhibit M) (explaining that "[g]as chromatograph analysis *has failed to identify an accelerant*"); (b) Agents Petraitis and Wick thereafter sent two more samples to ATF's crime lab and impressed upon Kinard the importance of their case, *see* Feb. 22, 1995 Evidence Transmittal Form (attached as Exhibit N); and (c) only then did Kinard conclude that any of the samples showed the presence of burnt gasoline.[12] *Compare* Feb. 15, 1995 ATF Memorandum (attached as Exhibit O) *with* Feb. 23, 1995 Laboratory Report (attached as Exhibit P), *and* Feb. 28, 1995 Laboratory Report (attached as Exhibit Q).

81.    Mr. Kinard is now deceased.

82.    Without the ability to re-test the physical evidence or examine Kinard (the only witness who could possibly validate/answer questions regarding the

---

[12]    In a recent Indiana state court decision involving another ATF arson case from around the same time, a conviction was vacated and a new trial granted based upon a finding that Mr. Kinard and ATF failed to produce a draft report by Kinard, in an analogous situation, where Kinard initially found no evidence of an accelerant, but later altered his conclusion and testified at trial that lab testing showed the presence of an accelerant. *See Bunch v. State*, 964 N.E.2d 274 (Ind. Ct. App. 2012).

original testing of the evidence), Mr. Brown's will be severely handicapped in challenging ATF's opinion that the fire was incendiary.

### C.     Ill Health, Faded Memories and Unavoidable Confusion

83.     Given the passage of over 22 years since the fire, it is a given that all of the witnesses have aged and many memories have faded or been erased.

84.     By way of example only, across-the-street neighbor Jean Ferguson, who gave favorable testimony to the defense in recounting the events of the night – and, in particular, the arrival at her house by Greg and his mother, Darlene, well after fire equipment arrived – is now 91 years old and lives in a senior center.

85.     Keith Wright, the only witness who claimed to have seen Greg on the scene before fire personnel arrived, had an already fuzzy memory at the PCRA hearing, and further testified that his physical health had severely deteriorated. *See* Feb. 15, 2012 PCRA Hearing Transcript at 10-66.

86.     Margaret McCord, Wright's mother, who lived in the first floor of the same house Wright occupied and contradicted her son's version of events by testifying that she awoke Wright *after* fire equipment was on the scene while he claimed he was awake and looking out the window, T-II.T. at 44-46, is now deceased.

87.     Given the retirement of now-retired Agent Petraitis, the prosecution has indicated its intention to use a new expert witness to "validate" the opinions given by Kinard and others.

88.     Even if this court is somehow able to navigate the evidentiary quagmire created by the destruction of the evidence, the inevitability of second-hand accounts, vouching and dueling transcripts (trial and PCRA hearings) – not to mention the established fact that the prosecution willfully violated Mr. Brown's due process rights and, as a result, he spent the last two decades in prison – juror confusion cannot be avoided.[13]

## ARGUMENT

## I.     Due Process Requires Dismissal of the Indictment.

Twenty years ago, a joint state and federal prosecution team secured a guilty verdict against Greg Brown on the word of two witnesses who – unbeknownst to the defense, the court and the jury – expected payment and ultimately were paid for their testimony.  Due to a toxic mixture of intentional concealment and willful ignorance by members of the prosecution team, it took an enormous effort, spanning many years, for Mr. Brown and his team to discover the breadth of the

---

[13]    That Mr. Brown spent the past 22 years in prison is not only significant because his incarceration precluded him from finding and preserving evidence and witness testimony that would aid in defense of the charge.  It is also significant because his lengthy incarceration could well negatively impact his credibility before the jury if he chooses to testify – and, given the passage of time and the problems caused as a result thereof, there is a heightened need for him to testify in his own defense.  The delay caused by the prosecution's misconduct unfairly impinges on Mr. Brown's Sixth Amendment rights by leaving him (and the court) with a Hobson's choice:  let the jury know that he was previously (and wrongly) convicted and has spent most of his life in prison; or attempt to hide those critical facts from the jury in an effort to avoid bias as a result of the conviction and/or the disconnect with someone who has spent his entire adult life behind bars.  Either way, speculation and confusion will be unavoidable.

constitutional violations that led to his conviction. Well after the PCRA court vacated Mr. Brown's conviction and just before the start of a new trial in state court with dispositive motions pending, the prosecution team, comprised of many of the same players who were involved in the 1997 trial, abandoned their state case, and opted to charge Greg Brown in a federal indictment. Now, due to many factors – but mainly the lengthy passage of time, the unavailability of witnesses, and the prosecution's destruction of all physical evidence of the fire – Mr. Brown cannot get a fair trial today. Because the prosecution team's pattern of misconduct at trial and continued suppression of exculpatory evidence caused the delay which makes a fair trial impossible, dismissal of the indictment is the only appropriate remedy.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1967). "Evidence favorable to the accused" is not limited to evidence bearing directly on the culpability of the defendant. Rather, it includes impeachment evidence that is material to the case against the accused. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying that a defendant's life or liberty may depend"); *Davis v. Alaska*, 415 U.S. 308 (1974) ("the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination"); *United States v. Giglio*,

405 U.S. 150, 154 (1972) (reversing for *Brady* and *Napue* violations where prosecution withheld the fact that key government witness had been promised leniency, and elicited false testimony that witness had not been promised anything in exchange for testimony).

A separate due process violation occurs when the prosecution obtains a conviction through the use of false testimony. It has long been "established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269; *see also United States v. Agurs*, 427 U.S. 97, 103 (1976); *Giglio v. United States*, 405 U.S. 150, 153 (1972). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. A conviction based on false testimony must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Napue*, 360 U.S. at 271.

The Supreme Court long ago envisioned a case of "outrageous" law enforcement misconduct in which "due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973). The Third Circuit has held that "[w]hile retrial is normally the most severe sanction available for a *Brady* violation, where a defendant can show both willful misconduct by the government and prejudice, dismissal may be proper." *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 255 (3d Cir. 2005). Other courts agree. *See United States v. Pasha*, 797 F.3d 1122, 1139

(D.C. Cir. 2015) (recognizing that dismissal with prejudice may be appropriate to remedy *Brady* violation); *United States v. Lewis*, 368 F.3d 1102, 1107 (9th Cir. 2004) ("Courts . . . can dismiss actions where government attorneys have willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.") (internal quotation omitted); *United States v. Fletcher*, 801 F.2d 1222, 1225 (10th Cir. 1986) ("Absent evidence of police or prosecutorial bad faith or misconduct, dismissal of indictment is warranted only if the missing evidence possesses an exculpatory value that was apparent before the evidence was destroyed.").

At least one district court has dismissed an indictment with prejudice in a very analogous case where, in response to the defendant's "unrelenting" efforts to obtain *Brady* materials, the government "disclose[d] as little as possible, and as late as possible – even to the point of a post-trial *Brady* disclosure." *United States v. Dollar*, 25 F.Supp.2d 1320, 1332 (N.D.Ala. 1998). There, the court characterized the nature of the government's disregard of *Brady* as "flagrant[ ]." *Id.* at 1322.

In this case – where the prosecution: suppressed evidence that it paid witnesses; told at least one of them to lie about the financial arrangement; created and failed to correct a false impression with the jury that no reward fund existed; represented to multiple courts that none of the above occurred; and then, as its story began to unravel, disclosed as little as possible and engaged in categorical denials to the end – the misconduct here extends beyond a flagrant *Brady* violation. Dismissal of the indictment with prejudice is the only remedy available to deter

such a pattern of willful misconduct and ensure that the prosecution can no longer benefit from its violations of Mr. Brown's due process rights.

### A. The Prosecution Team's Violations of *Brady, Giglio*, and *Napue* Were Willful.

Government misconduct may be considered willful whether it is intention, or not. "[A] constitutional violation that results from reckless disregard for a defendant's constitutional rights constitutes willful misconduct. . . Thus, reckless misconduct, if prejudicial, may sometimes warrant dismissal." *Fahie*, 419 F.3d at 256 (holding that, although the prosecution had violated Fahie's due process rights, the misconduct was not willful). "A pattern of constitutional violations may . . . be used to show recklessness on the part of a prosecutor." *Id.* at 256.

The PCRA court's findings make clear that significant aspects of the prosecution's misconduct in this case were willful and intentional, finding, for example, that ATF Agent Wick "purposefully" failed to disclose the fact that he had discussions with Wright about money prior to trial. Ex. C (PCRA Op.) at 19. The court made very similar findings with respect to Wick's failure to disclose his conversations with Abdullah about money. *Id.* at 26. Although Wick testified at the PCRA hearing that he never discussed a reward with Abdullah, as the PCRA court explained, "[t]his testimony just cannot survive. It gets buried in an avalanche of evidence and common sense that shows otherwise." *Id.* Among that evidence is the fact that Agent Wick coached Abdullah to deny any promise of money, P.T. at 138 – which Abdullah did in response to questions from both prosecutor. T-II.T. at 134-135, 140.

Other members of the prosecution team acted willfully or recklessly, if not intentionally, in failing to take steps that would have caused compliance with *Brady,* and instead engaging in a series of denials and non-disclosures that caused decades of delay.  It is well established that the prosecutors had a duty to learn of and disclose any favorable information known to Agent Wick or any member of the prosecution team.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); s*ee also United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006) (recognizing that "[t]here is no question that the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession" to evidence the prosecutor knew or should have known existed); *Calley v. Callaway*, 519 F.2d 184, 224 (5th Cir. 1980) ("*Brady* and other means of criminal discovery indicate the need for disclosure of important information *known or available to* the prosecutor in order to promote the fair administration of justice") (emphasis added).

If, in the years following Greg Brown's trial, the prosecution team's representatives were somehow unaware of the expectation of payment of prosecution witnesses and the evidence of payment itself, surely their ignorance was willful.  Likewise, if ever there were a "pattern of constitutional violations," it is here.  The known misconduct began with the failure to disclose Wright and Abdullah's expectation of payment at the time of trial in violation of *Brady* and *Giglio*.  It continued when prosecutors, through their questioning of trial witnesses,

created the false impression that witnesses had no expectation of payment and that any expectation of a reward would be entirely baseless. *See Napue*, 360 U.S. 264. Then, as Greg Brown fought to uncover the circumstances of Wright's and Abdullah's cooperation in the years following his trial, the prosecution team disclosed only what they had to and, when payment could no longer be denied, falsely insisted witnesses had no expectation of payment when they testified.

According to the PCRA court, an "egregious lapse in judgment took place" during federal habeas proceedings. Ex. C (PCRA Op.) at 19. By that time, though both Wright and Abdullah had been paid, the prosecution continued its obfuscation and advised the federal habeas court that no witnesses had been paid. *Id.* at 20. On this score, the PCRA court assigned fault to AUSA Sweeney for his apparent lack of either candor or diligence. *See id.*; *see also Fahie*, 419 F.3d at 256 ("a pattern of violations" may "demonstrate reckless, and therefore willful, misconduct").

Even then, after the defense finally obtained documents (ATF receipts), in 2010, demonstrating that witnesses had, in fact, been paid, the prosecution team insisted that no witness had an expectation of payment prior to or during the 1997 trial. In an August 25, 2010 letter to the Innocence Institute, the prosecution, through the Acting United States Attorney, stated that "[t]he subject of the public reward offered by ATF for information regarding the Bricelyn Street fire did not arise during any of [the prosecution's] discussions with the witnesses [Wright and Abdullah];" rather, when the ATF paid the witnesses after the trial was over, "the witnesses were of course glad to receive the rewards, but they were also surprised

because they never asked for a reward and had never been told that they would receive a reward."  Ex. I.  The prosecution team even maintained this position after appeal and notwithstanding final and binding findings to the contrary.  *See, e.g.*, Ex. J (Commonwealth's Corrected Motion to Recuse) at 16-18.

It is important to note that the *Brady* violations were not revealed through a self-initiated disclosure by the prosecution.  Rather, proof of the *Brady* violations was gathered and presented in the face of vehement denials and what Judge Williams characterized as "predictable and consistent resistance." Ex. C (PCRA Op.) at 9.

The prosecution's "resistance" was "predictable" because it well knew the prejudicial impact of the undisclosed information and the false testimony it left uncorrected at trial.

The prosecution team's refusal to come to terms with its *Brady* obligations – specifically the duty of prosecutors to learn of and disclose favorable information in the possession of investigators and agents acting on their behalf – sets this case apart from cases involving inadvertent or reckless nondisclosure, as does the long period of time in which the prosecution team persisted in their subterfuge and obstruction of the truth.  This is especially so given the clear materiality of the information being withheld. *Cf. Fahie*, 419 F.3d at 255 (finding that prosecutor's misconduct in belatedly disclosing ATF gun trace report was not willful where materiality of the report was not clearly apparent and prosecutor produced report only a few months late).  At nearly every stage of the proceedings, the prosecution

stymied Mr. Brown's efforts to learn the truth with blanket denials and misinformation, and a finding of willful misconduct is supported fully by the record.

### B.     The Constitutional Violations Preclude a Fair Trial.

The pattern of willful misconduct prejudiced Greg Brown at his original trial, and continues to infect these proceedings today.  With the passage of over 20 years since the fire, during which witnesses have become unavailable and all physical evidence has been destroyed by the government, a new trial will be fundamentally unfair. Consequently, dismissal with prejudice is the only appropriate remedy.

Where "a defendant has demonstrated that his rights were violated and that the violation was willful," the court should "consider the degree of prejudice in fashioning an appropriate remedy." *Fahie*, 419 F.3d at 256, n.10 (declining to conduct a prejudice analysis because the defendant there failed to establish that the government misconduct was willful); *see also United States v. Rosenfield*, 780 F.2d 10, 11 (3d Cir. 1985) (holding that dismissal is warranted "only where the defendant is actually prejudiced . . . the challenged activity was something other than an isolated incident unmotivated by the sinister ends or . . . misconduct challenged has become entrenched and flagrant").

Mr. Brown easily satisfies the prejudice inquiry.  The PCRA court found that the *Brady* violation rendered "Greg Brown's [initial] trial so unfair that" that the court lacked "confidence in the guilt determination."  Ex. C (PCRA Op.) at 27.[14]

---

[14]   Then-ADA Marc Clark appeared to agree that Abdullah, in particular, would have lacked credibility if the jury were to learn of some *quid pro quo*. P.T. at 467.

Equally insidious and unfair prejudice will arise in a new trial, all because of the passage of time caused by the prosecution's many years of denials, deception, and destruction of evidence.

Due to the lengthy passage of time, another trial would not only be unduly burdensome, but fundamentally unfair. It would be much harder for Mr. Brown to defend against the charge today. Key witnesses have died. Memories have faded. Most significantly, however, the prosecution has destroyed every shred of physical evidence from the fire. What an expert can and will do is to provide a professional opinion regarding the egregiously incomplete, insufficient, unscientific and result-oriented investigation conducted by ATF – but that is not the same as having the evidence in hand to establish the actual cause of the fire which, in this case, was likely the basement furnace.[15]

Similarly, Mr. Brown expects to provide expert testimony that ATF Agent Kinard's interpretation of lab results was false; that Kinard's first opinion that there was no evidence of gasoline in samples submitted was accurate; and that, in fact, if gasoline had been used to set this fire, all 14 samples would have tested positive for the presence of gasoline, not just two as Kinard ultimately opined. But Kinard is now dead. And so Mr. Brown's counsel will not have the opportunity to

---

[15]    The furnace was discarded without more than a visual inspection by Agent Petraitis. T-I.T. at 158-162, 303. Had an expert fully inspected the furnace, she could have determined whether it was the cause of the fire. The best an expert could say today, without the ability to inspect the furnace, is that the furnace cannot be ruled out as the cause.

inquire of Kinard himself into the details of his lab testing, analysis and results, but instead will be forced to take on new ATF witnesses who inevitably will deny any suggestion of impropriety or weakness in Kinard's opinions.

The prosecution has already noticed their intention to call a new ATF agent – Agent Matthew Regentin – who is one of the agents who submitted an affidavit in state court claiming that Judge Williams was biased against him.  Agent Regentin evidently is set to opine that he has reviewed everything done by his predecessors at the ATF and finds no fault whatsoever in their investigation or its results.  Oct. 8, 2015 ATF Report of Investigation, Origin and Cause Review and Analysis Report (Matthew Regentin) (attached as Exhibit R).[16]

As a result of the prosecution's misconduct at trial and concealment thereafter, jurors will not hear from *any* experts who actually examined the evidence.  Had the prosecution complied with its *Brady* obligations or acted with a modicum of candor in the decades since, the unfair prejudice to Mr. Brown could have been prevented or, at the very least, mitigated. Indeed, the problems associated with a trial years after the incident are greatly exacerbated by the destruction of all relevant evidence – something that may not have occurred had the prosecution acknowledged the violations of Mr. Brown's due process rights and accepted that a new trial was required. It is difficult to imagine defending an arson

---

[16]   Because Mr. Kinard is dead, counsel obviously will not be able to question him directly about the details of his lab testing and results or the circumstances that led him to change his initial opinion that there was no evidence of gasoline in the samples submitted for testing.

case before a jury where, as here, there is a critical dispute about the cause of the fire, without the ability to examine a single piece of evidence from the fire.

The Supreme Court has recognized that the Constitution imposes a duty on law enforcement to preserve evidence that "might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). The prosecution's "failure to preserve potentially useful evidence" constitutes a denial of due process where the defendant has shown "bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

The Tenth Circuit has recognized that where "the disposition of evidence that is central to the case [has] permanently deprive[d] the defendant of due process," dismissal is appropriate. *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994). In *Bohl,* the case against the defendant turned on whether non-conforming steel had been used to build FAA towers under a government contract, but the government removed the towers while the defendant's request to test them was pending. Even though the court said "the exculpatory value [of the evidence] was latent, rather than patent" because it was impossible to know what tests of the discarded steel would have shown, the destruction of this evidence was the determining factor in the court's decision to dismiss the charges. *Id.* at 910.

In the analogous case of *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), the court affirmed a dismissal of charges as an appropriate remedy for government spoliation of lab equipment in a methamphetamine manufacturing case where defendants' expert testified that if defendants' description of the equipment

was accurate, the equipment could not manufacture methamphetamine, but that he could not make a firm determination without examining the equipment itself.  That is the case here, where defense experts can fairly opine regarding the government's fire investigation and its interpretation of lab results, but likely cannot render a firm opinion as to the actual cause of the fire because the only physical evidence from the fire has since been destroyed and thus cannot now be tested and analyzed.

The prosecution has deprived Mr. Brown of the opportunity to make use of the physical evidence, so that prejudice is manifest. As such, dismissal with prejudice is the only remedy that will "neutralize the taint" of the constitutional violations involved here. *Morrison*, 449 U.S. at 365; *see also Pasha*, 797 F.2d at 1139 (holding that dismissal with prejudice is appropriate "if the lingering prejudice of a *Brady* violation has removed all possibility that the defendant could receive a new trial that is fair").[17]

---

[17]    In *Pasha*, the prosecutor waited until the eve of trial to disclose that a witness, who at one point provided a report consistent with the government's theory of the perpetrators' identities, had previously, and much closer in time to the events in question, given "a scene-of-the-crime account that, if credited would contradict the identity of at least one of" the defendants in the case.  *Pasha*, 797 F.3d at 1127, 1133. The undisclosed interview took place eight months prior, and the relevant events took place three years before that.  *Id.* at 1135.  By the time the defense interviewed the witness, he stated: "If you talked to me last year I would have been able to tell you more," *id.*, though it was unclear whether his account would have been favorable to the defense.  *Id.* at 1140.  The defense requested that, as a remedy for the *Brady* violation, the prosecution be barred from cross-examining the witness regarding his inconsistent accounts.  *Id.* at 1128.  The court denied the request, and the defense ultimately did not call the witness at trial.  *Id.* at 1128.

On appeal, the D.C. Circuit held that defendant was entitled to relief for the *Brady* violation, and noted that "something more than a new trial is required to avoid prejudice to" the defendant because, without more, the government could

In holding that dismissal with prejudice may be the appropriate remedy in cases involving deliberate misconduct, the Third Circuit reasoned that the availability of this severe sanction would have a deterrent effect, even if rarely imposed. The Court explained that "[d]eliberate misconduct is targeted for extra deterrence because we expect willful misbehavior to be the most effectively deterred by enhanced penalties." *Fahie*, 419 F.3d at 255. *See also Nat. Hockey League v. Met. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) ("[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, *but to deter those who might be tempted to such conduct in the absence of such a deterrent*") (emphasis added).

As the court stated in *Vaughn v. United States*, "By now government prosecutors should know: 'Betray *Brady*, give short shrift to *Giglio*, and you will lose your ill-gotten conviction.'" 93 A.2d 1237, 1267 (D.C. 2014) (quoting *United States v. Olsen*, 737 F.3d 625, 633 (9th Cir. 2013) (Kozinski, C.J, dissenting from denial of petition for rehearing *en banc*)). Here, handing the prosecution team a second bite

---

simply cross-examine the witness regarding the prior inconsistent statement, effectively eviscerating its exculpatory value. *Id.* at 1140. The Court remanded with instructions that the district court determine whether a remedy short of dismissal could be crafted to ensure the defendant a fair trial notwithstanding the delayed disclosure. *Id.*

Once remanded, the district court dismissed the indictment against Pasha with prejudice. *See United States v. Pasha*, Case No. 1:11-cr-00102-GK (D.C.), Doc. Nos. 416, 417. The court should dismiss with prejudice here, where the dangers identified in *Pasha* exist and the prejudice resulting from the prosecution's misconduct is more wide-ranging and severe.

at convicting Mr. Brown will neither remedy the prejudice nor deter this type of egregious misconduct.  Therefore, this court must dismiss the indictment with prejudice.

## II.    Double Jeopardy Protection Requires Dismissal of the Indictment.

The Double Jeopardy Clause forbids Greg Brown's retrial – now in federal court – because the prosecution team, as a team, obtained a conviction for the same underlying conduct in state court by the intentional misconduct of its team members.  Thereafter, a court vacated the conviction and the prosecution team subsequently abandoned the reinstated state charges. Under these circumstances, the federal charges are barred by double jeopardy and must be dismissed.

The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. Amend. V.  The protection applies both to successive punishments and to successive prosecutions for the same criminal offense.  *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969)).

### A.    Dual Sovereignty Doctrine Does Not Apply Here.

Normally, the Double Jeopardy Clause does not bar federal prosecution of acts previously prosecuted by state authorities.  *See Abbate v. United States*, 359 U.S. 187, 195-96 (1959).  However, an exception to the dual sovereignty doctrine exists where federal and state sovereigns do not act separately, but rather in unison; for example, where one sovereign exerts control and dominion over the acts

of another in its prosecution of a case. *See, e.g., Bartkus v. Illinois*, 359 U.S. 121,
124 (1959) (upholding state prosecution that followed on the heels of acquittal for
same conduct in federal court where "[t]he state and federal prosecutions were
separately conducted"). In other words, the dual sovereignty doctrine does not apply
where the sovereigns are not acting independently.

At least one district court has applied the *Bartkus* exception to bar a federal
prosecution that followed a state prosecution for the same conduct under
circumstances very similar to those presented here. *See United States v. Belcher*,
762 F.Supp. 666 (W.D. Va. 1991). In *Belcher*, two individuals were originally
prosecuted in Virginia state court for manufacturing marijuana. *Id.* at 668. One
moved to dismiss the indictment on due process grounds because state officials
destroyed what the government claimed was marijuana before testing it, and that
motion was granted. *Id.* The other defendant failed to timely raise the issue, was
convicted, but then was granted a new trial on grounds unrelated to the destruction
and failure to test. *Id.*

As the reinstated charges were pending, the prosecutor, who was employed as
an attorney for the Commonwealth *and* as a Special Assistant to the United States
Attorney for the Western District of Virginia, sought a federal indictment against
both defendants. *Id.* at 668. The prosecutor then moved to *nolle pros* the
indictment pending against the one defendant in state court. *Id.* As in our case, the
state court granted the motion over the Defendant's objection. *See id.* Thereafter,

the defendants moved to dismiss the indictment, in part, on double jeopardy and collateral estoppel grounds.  *Id.* at 669.

The federal district court found that the *Bartkus* exception applied to defeat the notion of dual sovereignty where one sovereign's prosecution amounts to a prosecution for another.  *Id.*  The court noted that the Supreme Court had offered "little explicit guidance for applying the [*Bartkus*] rule to future cases," but concluded that the rule was "best understood and applied in a situation where the principles of federalism are blurred and 'the power of centralized government' works to deprive a citizen of fundamental rights.'"  *Id.* at 670.  Because the prosecutor in *Belcher* served as a prosecutor at both the State and federal levels, the court concluded that the prosecutor's exercise of power was "inconsistent with the concepts of federalism implicit in the Constitution," sensibly observing that the notion of dual sovereignty can only be fairly applied where the federal and state governments act independently and, "in doing so each 'is exercising its own sovereignty, not that of the other.'"  *Id.* at 671 (citing *United States v. Wheeler*, 435 U.S. 313, 320 (1978)) (other citations omitted).  In the court's estimation, "[t]he fact that the two sovereigns have essentially pooled their powers in one prosecutor, strongly suggests . . . that in reality there are no longer two separate sovereigns at work.  Instead, the pooling of a prosecutorial power effectively creates one 'super sovereign,' *i.e.*, a unitary government."  *Id.* at 671.  On those grounds, the court held that the prosecution was barred.  *Id.*

In this case, by their own acknowledgement, state and federal authorities have worked in unison from the start of the investigation, through the prosecution in state court and in trying to protect the wrongful conviction they obtained against Greg Brown.  AUSA Sweeney, who remains assigned to this case, was cross-deputized in 1997 and prosecuted the case in state court, together with the Allegheny County District Attorney's office, 20 years ago.  The team effort continues to this day, as state and federal prosecutors again join forces against Mr. Brown. The Allegheny County District Attorney's office has had one of its attorneys, Rebecca Walker, designated to serve as a Special Assistant United States Attorney, and she and AUSA Sweeney will prosecute the matter in federal court, having together decided to flee the state court.[18]

Also, the decision to abandon the state forum and prosecute Mr. Brown in federal court was a joint decision, jointly announced, and the Commonwealth, by its own admission, is expressly pursuing its interest in federal court.  According to the Assistant District Attorney assigned to try the case with the United States Attorney's office, "[t]he federal prosecution provides *the Commonwealth* with evidentiary benefits . . . *The Commonwealth* has been advised by supervisors within the ATF that the ATF would fight our efforts to subpoena several of their or certain of their agents should we proceed in state court. Therefore, *we* would lose those

---

[18]    That Ms. Walker was not personally involved in the first prosecution does not impact the double jeopardy inquiry under *Bartkus.*  It is the interdependence and unity of purpose and action by the two sovereigns that triggers the *Bartkus* exception.

witnesses, which would greatly hinder *our* ability to try the case, as would the loss of motive evidence." Nov. 16, 2016 Hearing Transcript, at 11 (emphasis added). *See also* Nov. 4, 2016 Hickton Press Release.

The federal and state governments have always worked on this case in unison, bringing the full force of both sovereigns against Mr. Brown. Consequently, the *Bartkus* exception applies here, and the dual sovereignty doctrine has no application. The federal prosecution cannot survive a double jeopardy challenge on dual sovereignty grounds.

## B. The Federal Indictment Charges the Same Offense as the Prior State Proceeding.

The charge now waged against Mr. Brown in federal court is the "same offense" he was charged with in state court over 20 years ago. "For purposes of double jeopardy analysis, two offenses are the same if one is a lesser-included offense of the other under the 'same-elements' (or *Blockburger*) test. This test 'inquires whether each offense contains an element not contained in the other; if not, they are the "same offense"'…" *United States v. Miller*, 527 F.3d 54, 73 (3d Cir. 2008) (quoting *United States v. Dixon*, 509 U.S. 688, 696 (1993)). *See also Blockburger v. United States*, 284 U.S. 299, 304 (1932) ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not"). Under *Blockburger*, "[t]he elements of the offense are compared *in the abstract*, without looking to the facts of

the particular case." *Government of Virgin Islands v. Joseph*, 765 F.2d 394, 396 (3d Cir. 1985) (emphasis in original).

The indictment charges Mr. Brown with malicious destruction of property by fire resulting in death, in violation of 18 U.S.C. § 844(i).  This requires proof of the following elements: (1) that the Defendant set a fire, or caused a fire to be set, in order to damage or destroy property; (2) that he acted maliciously; (3) that the property was used in interstate commerce or in an activity affecting interstate commerce; and (4) that the defendant's conduct was the direct or proximate cause of the death of a person.  *See* Doc. No. 2.  Under *Blockburger*, this is the "same offense" as that prosecuted in state court – Pennsylvania felony murder (arson) – because the state offense is a lesser-included offense of the offense charged in the federal indictment

A person may be found guilty of second-degree felony murder (arson) under Pennsylvania's Crimes Code if the prosecution establishes the following elements: (1) that the defendant caused someone's death; (2) that the defendant did so while committing arson; (3) that the defendant was acting with malice. PA Standard Criminal Jury Instructions, § 15.2502B, Second-Degree Murder.  Arson is defined as willful and malicious burning.  *Commonwealth v. Leslie*, 424 Pa. 331, 334 (1967); *see also* 18 Pa.C.S. § 3301(a).

The below visual depiction of the respective elements of the two offenses shows that the felony-murder offense prosecuted in state court is a lesser-included offense of the federal offense charged here:

| Malicious destruction of property by fire resulting in death, 18 U.S.C. § 844(i) | PA second-degree felony murder (arson) 18 Pa.C.S. § 2502(b) |
|---|---|
| intentionally | intentionally |
| sets a fire, or caused a fire to be set, in order to damage or destroy property                                        ≥ | starts a fire or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another (*see* 18 Pa.C.S. § 3301(a)) |
| directly or proximately causes death of another person                                        ≥ | caused the death of another person |
| property was used in interstate commerce or in an activity affecting interstate commerce | [No equivalent elements of state offense] |

Pennsylvania second-degree murder (felony murder – arson) is a lesser-included offense of the federal crime of "malicious destruction of property by fire resulting in death" because every element necessary to prove the state crime is also an element of the federal offense, and all of the elements of the state offense are subsumed in elements of the federal offense. Thus, under the *Blockburger* test, the federal offense is the "same offense" that was charged and prosecuted in state court. *See Brown v. Ohio*, 432 U.S. 161, 168 (1977) (holding that joyriding and auto theft are the "same offense" for purposes of double jeopardy because "the lesser offense of joyriding requires no proof beyond that which is required for conviction of the greater auto theft").

C.   **This Federal Prosecution Constitutes an Unconstitutional Second Jeopardy.**

"Although the primary purpose of the Double Jeopardy Clause was to protect the integrity of a final judgment, [the Supreme] Court has also developed a body of

law guarding the separate but related interest of a defendant in avoiding multiple prosecutions even where no final determination of guilt or innocence has been made." *United States v. Scott*, 437 U.S. 82, 92 (1978) (internal citation omitted). Specifically, "the Double Jeopardy Clause protects a criminal defendant from multiple successive prosecutions for the same offense that arise from prosecutorial overreaching engaged in with the deliberate intent of depriving him of having his trial completed by a particular tribunal or prejudicing the possibility of an acquittal that the prosecutor believed likely." *United States v. Pavloyianis*, 996 F.2d 1467, 1473 (2d Cir. 1993) (citing *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982) (holding that, where prosecution engages in harassment, overreaching, or other misconduct at trial, with the intent of causing mistrial, a defendant "may . . . raise the bar of double jeopardy to second trial after having succeeded in aborting the first on his own motion")); *see also United States v. Cavanaugh*, 948 F.2d 405, 417 (8th Cir. 1991) (holding that double jeopardy clause bars retrial for assault where "government's deliberate trial strategy caused the first trial to terminate without the jury passing upon the charge").

The Supreme Court provided the rationale for this rule in *Oregon v. Kennedy*, which involved a state court criminal trial that ended when the defendant's motion for a mistrial was granted after the prosecutor asked a prejudicially improper question. *Kennedy*, 456 U.S. at 669. Thereafter, the trial court denied a motion to bar retrial on double jeopardy grounds, finding that the prosecutor had not intended to cause a mistrial. *Id.* at 670. The state appellate

court reversed, concluding that retrial was barred, regardless of whether the prosecutor intended to cause a mistrial, because the prosecutor had engaged in "overreaching." *Id.* The Supreme Court rejected the broad rule adopted by the appellate court, and ruled that the circumstances in which the Double Jeopardy Clause would bar retrial "are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679.

The rule from *Kennedy* applies equally to the prosecutorial overreaching here – namely, multiple *Brady* violations, coaching a witness to deny a *quid pro quo* for testifying*,* and failing to correct false testimony – all for the purpose of gaining a greater chance of conviction. As the Second Circuit has recognized, there is "no justification" for limiting the rule to the mistrial context. *See United States v. Wallach*, 979 F.2d 912, 916 (2d Cir. 1992). A prosecutor may be tempted to engage in misconduct "to prevent an acquittal that . . . [he] believed at the time was likely to occur in the absence of his misconduct." *Id.* Thus, the rule from *Kennedy* should apply not only where the prosecutor, by his intentional misconduct, provokes a mistrial, but also where he "avoids the acquittal by an act of deliberate misconduct." *Id.* "Indeed, if *Kennedy* is not extended to this limited degree, a prosecutor apprehending an acquittal encounters the jeopardy bar to retrial when he engages in misconduct of sufficient visibility to precipitate a mistrial motion, but not when he fends off the anticipated acquittal by misconduct of which the defendant is unaware until after the verdict. There is no justification for that distinction." *Id.*

(applying *Kennedy* where government pursued charges after defendant's conviction was reversed on appeal for government witness's perjury, and holding that prosecution error did not bar retrial because, even if prosecutors had known of falsity of witness's testimony, they would not have feared an acquittal due to the strength of the evidence). *See also United States v. Gary*, 74 F.3d 304, 315 (1st Cir. 1996) (applying *Wallach* in circumstances where defendant raised double jeopardy argument based on prosecutorial misconduct following a first trial ending in a hung jury).

The Third Circuit also has recognized *Kennedy*'s application beyond the mistrial context. *United States v. Curtis*, 683 F.2d 769, 774 (3d. Cir. 1982) (acknowledging "force to" argument that "concerns underlying the application of the double jeopardy clause to mistrials should apply with equal weight" to appellate reversals resulting from prosecutorial misconduct intended to cause a mistrial); *United States v. Liburd*, 405 Fed. App'x 670, 671-72 (3d Cir. 2010) (applying *Curtis*). The reasoning articulated in *Kennedy* and *Curtis* apply to bar the retrial in this case.

The record supports the conclusion that the prosecution team's misconduct was motivated by a fear of an acquittal. Law enforcement did not have a case against Mr. Brown without Wright and Abdullah, and the *Brady*, *Giglio*, and *Napue* violations were specifically intended to protect the credibility of these key witnesses at any cost. Although the misconduct here did not provoke a mistrial because it was

not discovered until years after Greg was convicted, it nonetheless triggers the protections of the Double Jeopardy Clause.

In sum, jeopardy attached after the PCRA court granted a new trial on the state charges and subsequently granted the prosecution's motion to *nolle prosequi* the charges only two months before trial.[19] This federal prosecution is barred because it constitutes a second jeopardy for the same offense.

---

[19]     Ordinarily a Pennsylvania resident's constitutional protection against Double Jeopardy would not bar a federal prosecution following a state court prosecution. However, this case is unique, in that the Commonwealth prosecuted Greg Brown in such a manner that the double jeopardy provision of the Pennsylvania Constitution would bar a re-trial in state court by the prosecution team.  *See Commonwealth v. Smith*, 532 Pa. 177, 186 (1992) (holding that double jeopardy clause prohibited retrial where the Commonwealth "deliberately denied" the existence of agreement to provide leniency to chief witness who was awaiting sentencing for unrelated offenses). The Pennsylvania Supreme Court has also indicated that this principle may be extended to "any number of scenarios in which prosecutorial overreaching is designed to harass the defendant through successive prosecutions or otherwise deprive him of his constitutional rights." *Commonwealth v. Martorano*, 559 Pa. 533, 538 (1999) (holding that prosecutor's conduct met the *Smith* standard because where "the prosecutor acted in bad faith throughout the trial, consistently making reference to evidence that the trial court had ruled inadmissible, continually defying the trial court's rulings on objections, and . . . repeatedly insisting that there was fingerprint evidence linking Appellees to the crime when the prosecutor knew for a fact that no such evidence existed"). *See also Commonwealth v. Anderson*, 38 A.3d 828 (Pa. Super. Ct. 2011) (holding that double jeopardy principles barred retrial where prosecution improperly coached its lead witness regarding how to respond to questions at the witness's competency hearing after remand but before retrial).

There is no valid reason why this same prosecution team should be able to avoid application of state constitutional law, designed to prevent this very sort of government overreach, simply by changing forum.  "Courts abhor 'forum shopping . . . . It implies [a party's] belief that justice is unavailable to him in the first forum. Accordingly the foreign action may be disapproved to 'protect the jurisdiction' and the integrity of the local court, apart from prejudice to any party." *Yachere v. Yachere*, 26 Som. L.J. 196, 52 Pa. D. & C.2d 768, 777 (Somerset Cty. 1971) (citations omitted). This court should not abide the prosecution team's forum shopping here.

III.    **The Statute of Limitations Bars Prosecution of the Indictment.**

This one-count federal indictment was not lodged until well over 20 years after the alleged offense took place.  As the charge is not "punishable by death," it is barred by the five-year statute of limitations, and must be dismissed.

Title 18, Section 3282 contains the five-year, general federal statute of limitations, which applies to "any offense, not capital. . . ." 18 U.S.C. § 3281, by contrast, provides that "any offense punishable by death may be found at any time without limitation." Although a violation of 18 U.S.C. § 844(i) generally carries a maximum term of imprisonment of 10 years, Count 1 of the indictment alleges that death resulted from the defendant's actions, and thus seeks an enhanced penalty of "any term of years, or life imprisonment." *See* 18 U.S.C. § 844(i) (providing that "if death results to any person, including any public safety officer performing duties as a direct and proximate result of conduct prohibited by this subsection," the defendant "shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment").

The charged offense is not "punishable by death" because the statutory maximum applicable sentence is life imprisonment. Mr. Brown was a juvenile at the time of the alleged offense. Congress expressly exempted juvenile offenders from eligibility for the death penalty, 18 U.S.C. § 3591(a)(2), and the Supreme Court has held that, as a constitutional matter, the death penalty cannot be imposed upon juvenile offenders. *Roper v. Simmons*, 543 U.S. 551, 575 (2005).

The Third Circuit has not yet addressed the question of whether an offense is "punishable by death" where, as here, the death penalty is categorically barred under the Eighth Amendment.  Those circuits which have found that a crime is "punishable by death" notwithstanding the fact that the death penalty was technically unavailable did not confront the question whether the unlimited statute of limitations in § 3281 applies when there is a categorical constitutional bar against the death penalty, such as that imposed in *Roper*, and their decisions are, therefore, distinguishable.  *See United States v. Gallagher*, 624 F.3d 934, 940 (9th Cir. 2010) (holding that crime was "punishable by death" for purposes of § 3281 even though Federal Death Penalty Act of 1994 made death penalty unavailable for defendant, who was alleged to have committed the offense on territory of tribe that had not elected to permit capital punishment); *United States v. Payne*, 591 F.3d 46, 58-59 (2d Cir. 2010) (rejecting an argument that § 3281 did not apply where government did not allege any of the statutory aggravating factors in the indictment and thus the death penalty could not be imposed); *United States v. Ealy*, 363 F.3d 292, 296-97 (4th Cir. 2004) (same); *Coon v. United States*, 411 F.2d 422, 425 (8th Cir. 1969) (holding that offense was punishable by death for purposes of § 3281 notwithstanding unconstitutionality of procedures in death provision of statute under which defendant was charged); *but see United States v. Korey*, 614 F.Supp.2d 573, 582 (W.D.Pa. 2009).

Because the indictment here does not allege an offense that is "punishable by death," § 3281 does not apply and the prosecution is barred by the five-year statute

of limitations contained in § 3282. *Cf. United States v. Davis*, 576 F.2d 1065, 1067 (3d Cir. 1978) (finding that "chargeable under state law," as used in 18 U.S.C. § 1961(1)(A), means "chargeable under state law at the time the offense was committed").

## IV.   Dismissal on Vindictive Prosecution Grounds is Warranted.

After prosecuting Greg Brown in state court for the last 20 years, the joint federal and state prosecution team dramatically changed course, abandoning the reinstated state charges and seeking a federal indictment.  The timing of this move raises a presumption that the prosecution's decision to "up the ante" and charge Mr. Brown federally was motivated by vindictiveness, specifically, a desire to punish him for his successful exercise of his right to challenge his conviction and his attempt to obtain dismissal of the reinstated state charges by shining a light on the prosecution team's misconduct.

In *North Carolina v. Pearce*, 395 U.S. 711 (1969), the Supreme Court announced the fundamental principle that due process does not allow a criminal defendant to be punished for exercising his rights.  *See also United States v. Goodwin*, 457 U.S. 368 (1982) ("For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right.").  Such punishment would not only taint criminal prosecutions with improper motives, but it may also have a devastating individual and systematic chilling effect on the exercise of important rights.

In *Blackledge v. Perry*, 417 U.S. 27 (1974), the Court applied this principle to prosecutorial conduct, holding that any circumstances or charging decisions that pose a "realistic likelihood" of vindictiveness offend due process.  The Court was careful to point out that only a "realistic *likelihood*" is required, as it recognized requiring proof of actual vindictiveness would pose an insurmountable burden.  *Id.* at 27-28 (emphasis added) (noting that decision was not based on the need to correct the prosecutor's "actual" motivation, but rather on the general need to rid these interactions of any perceived vindictiveness or potential for retaliation). Thus, the Court employed a presumption – a presumption of vindictiveness that applies when the circumstances suggest realistic reasons to fear vindictiveness.

In *Blackledge*, the defendant was convicted of a misdemeanor and, following his successful appeal, the prosecution obtained a new indictment charging him with a felony for the same conduct.  *Id.* at 22-23.  Although there was no evidence of prosecutorial bad faith or maliciousness, the Court nevertheless held that when a defendant successfully exercises his right to appeal, the prosecutor cannot respond by charging more serious crimes or those which subject him to a significantly increased period of incarceration.  *Id.* at 28.  According to the Court, such a rule is required to ensure there is no potential for vindictiveness and also to ensure that defendants are not discouraged from exercising their statutory right to appeal.  *Id.* at 28-29.

In this case, the prosecution team "upped the ante," *Blackledge*, 417 U.S. at 28, by seeking a federal indictment charging Mr. Brown for the same alleged

conduct that served as the basis for a state prosecution spanning 20 years – after Mr. Brown successfully exercised his right to challenge his conviction and was granted a new trial after exposing the prosecution's misconduct.  In explaining its decision to abandon the state prosecution and proceed against Mr. Brown in federal court, the prosecution explained that the state court no longer offers the prosecution the "benefit" of a mandatory life sentence in this case, *see* Nov. 16, 2016 Hearing Transcript, at 10-11, whereas the federal charge would likely yield a guidelines range of life in prison due to the deaths of the firefighters. *See* U.S.S.G. § 2K1.4(c)(1); § 2A1.1.

The circumstances here establish a presumption of vindictiveness. *See United States v. Korey*, 614 F.Supp.2d 573, 582-86 (W.D.Pa. 2009) (applying presumption of vindictiveness, and dismissing on vindictive prosecution grounds where the government charged a more serious § 924(c) count for the same alleged conduct after defendant successfully appealed his conviction and later obtained dismissal of reinstated § 924(c) charge on speedy trial grounds, reasoning that "[t]he government upped in the ante . . . in terms of the applicable statute of limitations and the possible punishments").  As in *Korey*, this court should dismiss the indictment.

If the prosecution is permitted to proceed under the facts and circumstances of this case, it will send a dramatic signal to defendants who choose to challenge their convictions and expose governmental misconduct that they cannot be "freed of

apprehension" and that their pursuit of legal rights will be met with retaliation. *Blackledge*, 417 U.S. at 28.  Due process cannot countenance such a result.


CONCLUSION

Twenty years ago, the prosecution team cheated Mr. Brown out of his constitutionally-guaranteed right to a fair trial.  They then denied and concealed their wrongdoing over many years as evidence was discarded and time passed.  The consequence for this egregious conduct cannot simply be a "do-over" trial involving faded memories, destroyed evidence, dead witnesses and inevitable jury confusion.  Such a trial would unduly and unfairly prejudice Mr. Brown.  More importantly, allowing the government another chance to prosecute this case, twenty years after the fact, would not deter government misconduct. Rather, it would send a clear message that the government can trammel a man's constitutional rights, conceal its misconduct as that man sits in jail, and – should it get caught – simply be given the opportunity to prosecute again.  If the law has meaning, such a result cannot stand.

Respectfully submitted,


**/s/ David B. Fawcett**
David B. Fawcett, Esq.
Pa. Attorney I.D. No. 44494

Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222-2716

**/s/ Michael J. Novara**
Michael J. Novara
First Assistant Federal Public Defender
Pa. Attorney I.D. No. 66434

**/s/ Samantha L. Stern**
Samantha L. Stern
Assistant Federal Public Defender
N.Y. Attorney I.D. No. 5025663